**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Octavia Altheimer-Umphlett,

 *Plaintiff,*

v.

Louis DeJoy, Postmaster General for the
United States Postal Service,

 *Defendant*

No. 20 CV 7406

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Octavia Altheimer-Umphlett ("Plaintiff" or "Umphlett") brings suit against Louis DeJoy, in his official capacity as Postmaster General for the United States Postal Service ("Defendant"), for employment discrimination in violation of the Rehabilitation Act. Currently before the Court is Defendant's motion for summary judgment [Dkt. 18]. For the following reasons, the motion is denied.

## I. Background

The following facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits [Dkts. 20, 23, 24, 30] and are undisputed except where a dispute is noted. Umphlett has been an employee of the United States Postal Service ("USPS") since 2018. Prior to working at the post office, Umphlett earned a doctorate in health administration from Central Michigan University in 2015 and worked as the Senior Director at a medical billing service before leaving in 2017 to become a consultant. [See Dkt. 23, ¶¶ 5-6.] Umphlett began working for the USPS on November 10, 2018 in the Park Forest location. Umphlett began with a temporary appointment as a noncareer Postal Support Employee ("PSE"). Umphlett's supervisors included

Postmaster Rhonda Vincent-Woodard ("Woodard"), Kantanya King ("King") and Aisha Skinner ("Skinner").

Sixteen days into her job, a heavy package fell and landed on Umphlett's right foot, injuring her. Umphlett was diagnosed with a "crush injury" and "complex regional pain syndrome." [Dkt. 23, ¶ 8.] It is undisputed that due to this injury, Umphlett has a physical disability that substantially limits one or more major life activities. [Dkt. 30, ¶ 1.] Umphlett stayed home from work for five months after her injury and has continuously received medical treatment for her disability. [Dkt. 23, ¶ 68.] While Umphlett was home from work in January 2019, USPS failed to pay her for 38 hours of "continuation of pay." [Dkt. 23, ¶ 10.] USPS eventually rectified the error and Umphlett was paid. [*Id.;* Dkt. 23, ¶ 59.]

Umphlett returned to work in late April 2019. According to Umphlett, Woodard had been "cordial" before her injury, but became "condescending" when Umphlett returned and would refer Umphlett's questions to another supervisor. [*Id.*, ¶ 58.] Due to her disability, Umphlett had work restrictions on lifting, standing, walking, and the number of hours she could work each day.

Upon her return to work, Umphlett asked her supervisor Skinner if she could work every other day due to her swollen foot. Umphlett did not provide a doctor's note reflecting this restriction, but Umphlett maintains that a note was not required.[1] At

---

[1]     In support, Umphlett cites to two pages of USPS Handbook EL-307 concerning "Reasonable Accommodation, An Interactive Process." [Dkt. 24-2 at 1-2.] The handbook "contains revisions to procedures and guidance on reasonable accommodation in employment and placement matters." [*Id.* at 1.] According to the handbook, "[r]equests for reasonable accommodation can be made orally or in writing." [Dkt. 24-2 at 2.] To request an accommodation, the employee "may use plain language and need not mention the

her deposition, Skinner could not recall the specifics of her April 2019 conversation with Umphlett. Skinner testified that she spoke with Woodard after speaking with Umphlett, but could not remember if she ever "circle[d] back around" to Umphlett. [Dkt. 20 at 111 (Tr. 79:2-81:9).] When asked, "[d]id you ever give [Umphlett] any information as to reaching out to draft or requesting a reasonable accommodation regarding her work schedule," Skinner replied, "no." [*Id*. (Tr. 80:12-15).]

On April 19, 2019, Woodard sent an email to herself concerning her conversation with Skinner. Woodard wrote:

> So Mrs. Umphlett ask Aisha can she work every other day because her foot is still swollen and she thinks it we should work with her and her schedule. I told Aisha NO! That is not on her ca-17 as requested by her doctor and she is to work as scheduled. Umphlett tells Aisha she is from [corporate] and she does not have to be here and we don't want people to work and this is why people are disgruntle[d] etc. NO…. I need people to work that is why you were hired! **She has not been any good to this organization since she hit the rol[l]s!**

[Dkt. 23, ¶ 60 (emphasis added).] The CA-17 referred to in Woodard's email is a form to be completed by an employee's medical provider indicating what an employee with medical restrictions is able to do. USPS creates a modified job assignment based on those restrictions, and the employee either accepts or rejects it. On April 29, 2019, Woodard and Skinner denied Umphlett's request for a scheduling accommodation. Umphlett characterizes this as a failure to engage in the interactive process required by the Rehabilitation Act, but Defendant asserts that Umphlett was "seeking a

---

Rehabilitation Act or use the phrase 'reasonable accommodation' to his or her supervisor or manager or the Manager, Human Resources (District)." [*Id*.] "The reasonable accommodation process is activated whenever" "[a] request for reasonable accommodation is made" or "[a]n employee with a known physical or mental impairment is observed having difficulty performing the essential functions of his or her job because of an impairment." [*Id*.]

scheduling accommodation outside of what was provided on her CA-17 form, which is the *product* of the interactive process." [Dkt. 30, ¶ 5.]

In May 2019, Woodard told Umphlett that she would be fired if she did not pass certain training (the parties refer to it both as "SSA" and "SSD training"). [See Dkt. 23, ¶ 61; Dkt. 30, ¶ 11.] Umphlett interpreted this as a threat because "other people didn't pass the SSD training and they were still employed," though Umphlett could not remember the names of any such employees. [Dkt. 23, ¶ 61.] After Umphlett completed the training, Woodard refused to provide Umphlett with a uniform voucher and required her to wear an old employee's used shirt, which was coming apart at the seams. [Dkt. 30, ¶ 11.] Woodard told Umphlett that she did not qualify for the allowance because she was on probation. [See *id.*]

On May 13, 2019, Woodard wrote herself another note about Umphlett, stating "I think she is not wrapped too tight and the elevator don't go all the way to the top. Now I know I really have to make sure I cross my t's with her sounds like she will be trying to set an EEO up." [Dkt. 20 at 294.] Woodard continued: "I haven't had but 2 conversations with her since she's been back. I need you to sign your modified job assign accept or decline and then today's conversation. So how did she get [I'm] out to get her? If you do you [sic] job I will not have anything to say to anyone at all hell!" [*Id.*] Woodard testified that she wrote such emails to herself because she believed that Umphlett would allege harassment and that Woodard needed to document their interactions. [Dkt. 23, ¶ 63.]

On June 13, 2019, Umphlett and Woodard had what has been described as a "tense encounter" and "shouting match" when Umphlett parked in the post office's loading dock area to reduce the distance she needed to walk to get into the building. [Dkt. 23, ¶ 14; Dkt. 20 at 193.] Woodard told Umphlett that she could not park in the dock because it was a loading zone. It was Woodard's policy (rather than a policy of the USPS) that no one could park in the dock because there had been accidents in the past when employees had parked there. [Dkt. 23, ¶ 17.] Woodard states in her EEO Investigative Affidavit that Umphlett "was provided additional parking choices for her convenience however she chose not to park in the designated parking provided." [Dkt. 20 at 159.] Umphlett disputes that the other parking options Woodard provided would have accommodated her disability. [Dkt. 23, ¶ 15.] According to Woodard, Umphlett became "combative" when told she could not park in the dock area. [*Id.*, ¶ 16.] According to Umphlett, Woodard was the rude one. [*Id.*, ¶ 18.] Umphlett testified that she was frustrated because she had previously been told by King and her union that she could park in the dock. [*Id.*]

Supervisor King observed part of this exchange, although she was not present when it began. [See Dkt. 23, ¶ 19.] At King's urging, the three women left the work floor and went into the Woodard's office to discuss the matter further. [Dkt. 20 at 132 (Tr. 24:2-23).] According to King's notes memorializing the discussion, Umphlett "stated that she felt [Woodard] was harassing and retaliating against her and how she has a PHD and has been employed with corporate before so she didn't have to be here and that she chose to work here at this job." [Dkt. 20 at 193.] According to King's

notes, Woodard responded by "asking [Umphlett] what ways she was harassing her but she really couldn't state any legitimate reasons" and "also stated multiple times that she didn't want to work here at this office and asked for a transfer but [Woodard] stated to her that she couldn't because she was a PSE." [*Id.*] King testified that Umphlett and Woodard both calmed down and "we went on … about our day-to-day." [*Id.* at 133 (Tr. 25:4-10).]

At her deposition, Umphlett recounted the June 13 incident differently. [Dkt. 20 at 40 (Tr. 70:15-21).] Most significantly, Umphlett denies that she requested a transfer when she met with Woodard and King that day. [Dkt. 23, ¶ 21.] Umphlett admits that King testified Umphlett "requested a transfer to a different facility more than once" and that PSEs like Umphlett "cannot simply request a transfer; she must resign and then reapply for a position elsewhere." [*Id.* ¶ 22.]

On June 20, 2019, either Woodard or King conducted Umphlett's 30-day probationary evaluation. [See *id.*, ¶ 23; Dkt. 30, ¶ 13.] Each testified that the other person completed the evaluation. [*Id.*] Umphlett disputes that she was still a probationary employee by this time. [See *id.*, ¶ 23.] Woodard asserts in her EEO affidavit that she had been misinformed by "labor" that Umphlett was still a probationary employee even though she was injured during the probationary period and was off work when she otherwise would have been reviewed. [Dkt. 20 at 163.] In section 7b of her evaluation, Umphlett is rated "unacceptable" in the categories of "Work Quality," "Work Relations," and "Work Methods." [Dkt. 20 at 195.]

King testified that Umphlett received the negative ratings "because of the back and forth with her and management. And then she didn't want to work there. So of course, if a person doesn't want to work there, they're gonna-you're gonna see it in their, you know, attitude or whatever." [Dkt. 23, ¶ 24.] Umphlett does not dispute that this is King's testimony, but disputes that these were the only reasons for her negative ratings. [See *id*.] Umphlett points to a "counseling questionnaire" that she received from King during the June 20, 2019 meeting, which indicated that Umphlett was "selected for the CARE program for … [r]ecent accidents and/or a history of one or more accidents (avoidable or not)." [Dkt. 24-7 at 1.] The questionnaire explains that "[t]he objective of the CARE program is to reduce employee accidents through interactive dialogue, retraining, mentoring, and recognition of potential safety hazards." [*Id*.] King also testified that she had to speak with Umphlett about not arguing with customers. [Dkt. 23, ¶ 25.] Umphlett denies that she has ever received a customer complaint. [*Id*.]

After receiving her 30-day evaluation, Umphlett went to Woodard's office to apologize for the parking incident. Umphlett testified that she did so not because she "was wrong," but because King explained to Umphlett that Woodard had been under a lot of stress, Umphlett felt empathetic, and King told Umphlett that she should apologize. [Dkt. 20 at 41 (Tr. 75:3-76:12).] Umphlett also stated that it was "a matter of respecting [Woodard's] position." [*Id*.]

On July 3, 2019, Woodard terminated Umphlett's employment during what Defendant characterizes as the 60-day "final probationary evaluation." [Dkt. 23, ¶

7

31.] Umphlett had not received any discipline prior to her termination. [Dkt. 30, ¶
26.] Woodard testified that she did not think this was necessary because she believed
Umphlett was still a probationary employee. [*Id.*] Umphlett also was not given any
prior written notice that she would be terminated, which according to Umphlett and
her union is required by the governing collective bargaining agreement. [*Id.*, ¶ 27.]
According to Defendant, Woodard conducted the 60-day evaluation only two weeks
after the 30-day evaluation because "we reacted based on whatever transpired that
day that warned us to make the decision that she wasn't conducive to the operation
based on her temperament." [Dkt. 20 at 76 (Tr. 56:2-11).] At her deposition, Woodard
testified that she could not "remember exactly what transpired that day" but claims
that "the supervisors brought it to my attention, and I said okay, that's it. And that's
when I decided that [Umphlett] was going to be terminated because she wasn't
cooperating with management." [*Id.*] King was also at the meeting "just … as a
witness" and that was "the only part [she had] in that evaluation." [Dkt. 20 at 145-46
(Tr. 76:23-77:6).]

Defendant maintains, based on Woodard's EEO affidavit, that Umphlett was
terminated for her conduct. [Dkt. 23, ¶ 32.] Woodard stated that Umphlett "had
several instances of being combative with management including an incident on
6/13/19 on the workroom floor with me. She did not follow instructions well, was very
defensive when performance is discussed. She made disgruntle[d] and condescending
comments about management and it would not have been acceptable for any
employee that was still in a probationary period." [Dkt. 20 at 163.] Umphlett disputes

that these were the real reasons why Woodard terminated her. Umphlett emphasizes that Woodard has not identified anything specific that happened between Umphlett's 30-day evaluation on June 20, 2019 and her 60-day evaluation on July 3, 2019—only 14 days later. [Dkt. 23, ¶ 32; Dkt. 30, ¶ 20.] King could not do so in her deposition. [See Dkt. 20 at 145 (Tr. 75:2-9).] In addition, Woodard testified that Umphlett received a score of "unsatisfactory" in the category of "work methods" because of her November 2018 injury, even though the injury had already been held against Umphlett in her 30-day review. [Dkt. 30, ¶ 22.]

The same day that Umphlett was terminated, Woodard wrote herself an email stating that she had had "5 topics of conversation" with Umphlett:

1. Her parking issue multiple times
2. Inappropriate clothing
3. Swiping to the correct location
4. Scanning using the pass
5. Requirement to pass window training to retain employment

Umphlett concludes the note with, "Other than that I hadn't said hi, gm or bye to her. So where is the retaliation?? SMH." [Dkt. 20 at 296; see also Dkt. 30, ¶ 24.]

According to Umphlett, several days after her termination management placed a false customer complaint in her personnel file. Umphlett's basis for assuming the complaint is false is that the form is dated July 9, 2019, which was 6 days after her termination. Defendants dispute this noting that date "merely indicates that the customer completed the form that date," and the incident could have occurred earlier when Umphlett was still employed by USPS. [Dkt. 30, ¶ 25; see also Dkt. 24-8.]

From the time she returned to work in April 2019 until she was terminated in July 2019, Umphlett made a number of internal complaints about how she was being treated due to her injury and disability. More specifically, between April and July 2019, Umphlett called USPS labor management employee Tim Markland over ten times and left him fix or six voicemails concerning "[t]he parking, the schedule change, the blowup," and how she "was being retaliated against due to [her] injury ... and disability." [Dkt. 20 at 55 (Tr. 131:12-132:15).] Umphlett also contacted another labor management employee, Oscar Obergone, three or four times to complain about "retaliation, discrimination because of my disability," "[t]he parking," and "[j]ust about everything leading up to" her eventual termination in July 2019. [*Id*. (Tr. 132:7-24).] Further, Umphlett complained of retaliation and disability discrimination to Skinner, Woodard and King based on Woodard's alleged refusal to accommodate her disability, Woodard's alteration of her work schedule, and the deletion of her "clock rings" showing when she swiped in and out for work. [Dkt. 30, ¶ 8.] Defendants dispute that Umphlett complained to Woodard about not having her disability accommodated. [See *id*.]

Umphlett contacted USPS's Equal Employment Opportunity ("EEO") office on July 17, 2019 and filed an informal complaint. Umphlett also filed a grievance regarding her termination. Umphlett's and her union's position was that she had already completed her probationary period during the time she was off work due to her foot injury. [See Dkt. 20 at 233-36.] USPS reached an agreement with the union on August 15, 2019 to reinstate Umphlett effective July 8, 2019, with backpay. The

document memorializing the settlement states: "The parties agree the Grievant shall return to the Park Forest Post Office as soon as administratively possible. She shall be made whole for all lost time and wages. Furthermore, Management will ensure the Grievant receives her full uniform allotment. The Union agrees that prior to the Grievant's return she will participate in a return to work meeting to include the USPS and the APWU. This meeting is to establish the expectations of the employee while performing her duties." [*Id.* at 238.] Management never held the meeting required by the grievance settlement. [Dkt. 30, ¶ 30.] King testified that when Umphlett was allowed to return to work, "[t]hat's when she was also granted the parking privilege" allowing her to park in the dock. [Dkt. 20 at 141 (Tr. 8-20).]

After the August 2019 agreement, Umphlett stayed home from work for medical reasons until late October 2019. When she returned to work, she had a work restriction limiting her to 4 hours of work per day. Defendant accommodated these restrictions [see Dkt. 23, ¶ 41], but Umphlett complained that Woodard refused to give her more than two hours of work per day. [Dkt. 30, ¶ 36.] On November 1, Umphlett provided Skinner with an updated CA-17, which increased her work limitations to six hours of work per day. [*Id.*, ¶ 38.] However, time records introduced by Defendant show that Umphlett worked just two to three hours per day on average from the end of October 2019 to December 9, 2019. [*Id.*, ¶ 36.] Umphlett did not receive a till (cash register drawer) when she returned to work in October 2019; according to Skinner this was because one was not immediately available. [*Id.*, ¶ 48.]

On November 14, 2019, Umphlett requested to have her cash register till back and to be scheduled at the window at the Forest Park location.

Woodard would not allow Umphlett to work the window at Park Forest upon her return to work in October 2019. Defendant claims that this is because Umphlett's restrictions prevented her from working the window [Dkt. 30, ¶ 31], but the grievance forms that Defendant cites does not say this; rather, Umphlett complains about not being allowed to work as a window clerk in her office while at the same time being sent to the Matteson office where she worked as a window clerk. [See Dkts. 24-10, 24-11.] Umphlett testified that she was sent to the Matteson Post Office for a week and the Richton Park Post Office for a couple of months. [Dkt. 30, ¶¶ 32, 33.] Skinner testified that she had no recollection of why Umphlett was not allowed to work at the window at Park Forest—Umphlett's home office—but was assigned to work the window at Matteson and Richton Park. [*Id.*, ¶ 35.] The employee that was brought on to replace Umphlett after her July 2019 termination was not required to work at Richton Park. [*Id.*, ¶ 34.]

Umphlett filed a formal EEO complaint on October 21, 2019. On November 20, 2019, Skinner, at Woodard's direction, sent Umphlett a "five-day notice" claiming that Umphlett had been absent for the previous five days without submitting acceptable medical documentation. [Dkt. 30, ¶ 41; Dkt. 20 at 300.] On December 12, 2019, Umphlett emailed Skinner complaining that she was being retaliated against because she was not being given the same number of hours at her home office, Park Forest, as the other clerk who was hired after her. [Dkt. 30, ¶ 43.] On December 13,

2019, Umphlett complained to Skinner of retaliation because management was continuing to send her to Richton Park where she was required to violate her lifting restrictions. [*Id.*, ¶ 44.] Umphlett filed an amended EEO complaint around December 20, 2019. [*Id.*, ¶ 49.]

According to Umphlett, between October and December 2019, she heard from a coworker that another co-worker, Aisha Crawford ("Crawford") was threatening Umphlett. Umphlett also testified that on one occasion, Crawford tried to hit Umphlett with her mail cart [Dkt. 23, ¶ 45]; Umphlett did not notify management about that incident when it happened [*id.*, ¶ 46]. On January 17, 2020, Umphlett and Crawford had an altercation. Skinner (and other employees) heard portions of the "conversation" between the two women, which included expletives. [*Id.*, ¶¶ 48-49.] Following the incident, Skinner placed Umphlett on "emergency placement." A January 21, 2020 letter concerning the emergency placement states that Umphlett "threatened to cause physical harm" to a co-worker and USPS has "Zero Tolerance" for violence in the workplace. [*Id.*, ¶ 50.]

Skinner did not place Crawford on emergency placement. Skinner states in her affidavit that this was because she did not consider Crawford to be the aggressor, but Umphlett "disputes that Crawford was not the aggressor because she bumped into" Umphlett. [*Id.*, ¶ 51.] During a pre-disciplinary interview with Umphlett on January 31, 2020, "Umphlett admitted to Skinner that she had said that she would "f**k up" Crawford a few times during the confrontation." [*Id.*, ¶ 52.] Umphlett also told Skinner, "I should have just hit her," which Skinner perceived to signal that

Umphlett did not have any "remorse" for her actions and left Skinner "concerned about the safety of her employees should another confrontation occur." [*Id.*, ¶ 53.]

Skinner issued Umphlett's notice of removal on February 7, 2020 and Postmaster Woodard concurred. [*Id.* ¶ 54.] Umphlett filed a grievance challenging her termination. As part of a grievance settlement, USPS reduced the removal to a warning. Umphlett returned to work in April 2020.

Following Umphlett's return to work in April 2020, King handled Umphlett's schedule. [See Dkt. 30, ¶ 55.] In November 2020, Woodard wrote an email to her supervisor, Debbie Blake-Moenich, stating that Umphlett "submitted some bogus medical." [Dkt. 20 at 298.] Woodard continued, "I told [Skinner] to deem it unacceptable and send a 5 day letter for acceptable documentation." [*Id.*] At her deposition, Woodard could not recall a particular reason why she believed the medical documentation to be "bogus."[2] [Dkt. 23, ¶ 67; see also Dkt. 30, ¶ 64.] In February 2021, Woodard emailed her supervisor Blake-Moenich about Umphlett: "Her initial injury she had 10 days after she got hired in Nov 2018 was her foot. A box allegedly fe[l]l on her foot no one knew about, saw or heard." [Dkt. 20 at 304.] In her response, Blake-Moenich referred to Umphlett's disability as "a non-existing condition." [Dkt. 24-14 at 1.]

Around March 23, 2021, Umphlett submitted updated medical documents concerning her disability. By the next day, Woodard contacted the USPC Office of Inspector General ("OIG") to report Umphlett's "possible falsification of medical"

---

[2] There is no evidence in the record that Umphlett submitted "bogus" medical documentation.

records. [Dkt. 23, ¶ 69.] Woodard never asked Umphlett about the medical documentation or directed Skinner or King to ask Umphlett about it. [Dkt. 30, ¶ 62.] OIG responded that it did not investigate such matters. Woodard forwarded OIG's response to Skinner and King, writing, "OIG don't have time to investigate. Back to the drawing board." [Dkt. 20 at 306.] Two minutes later, she emailed King again, "We going to have to stick to attendance." [*Id.*] King testified that Woodard told her and Skinner that "if you all don't get her on her attendance before she takes her break, basically, like we'll be stuck with her." [*Id.*, ¶ 73.] King testified that Umphlett was sent a pre-disciplinary letter concerning her attendance around March 2021.

Skinner testified that she never heard Woodard make a negative remark about Umphlett's disability or express that she would like to get rid of Umphlett because she is tired of dealing with her disability. [Dkt. 23, ¶ 56.] King testified that Woodard expressed a desire to terminate Umphlett because Umphlett "didn't want to work there anyways" and had a "nasty attitude." [*Id.*, ¶ 57.] King also reported that Woodard told her that "she was tired of [Umphlett] filing EEO complaints" [*id.*; see also Dkt. 30, ¶ 50] and that Woodard told her that Umphlett should "take a settlement and leave." [*Id.*, ¶ 51.]

Umphlett's governing complaint alleges a single count of "discrimination, harassment, and retaliation" in violation of the Rehabilitation Act. The parties have interpreted Umphlett's allegations to encompass four claims: (1) discrimination; (2) hostile work environment; (3) retaliation; and (4) failure to accommodate.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646

16

(7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## II. Analysis

### A. Local Rules 7.1 and 56.1(g)

A few preliminary matters require the Court's attention. First, Umphlett's summary judgment response brief fails to comply with Local Rule 7.1 or Local Rule 56.1(g). Local Rule 7.1 provides that "[n]either a brief in support of or in opposition to any motion . . . shall exceed 15 pages without prior approval of the court"; a non-compliant brief is "subject to being stricken by the court." N.D. Ill. L.R. 7.1. Because Umphlett did not seek prior approval to file a 27-page opening brief, [Dkt. No. 22], Defendant urges the Court to "disregard Umphlett's non-compliant response," or, in the alternative, "disregard the arguments on pages 16 through 27 of the overly long filing," which contains Umphlett's entire argument section. [Dkt. No. 29 at 2.]

Parties fail to comply with the local rules at their own peril. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). While the Court has "discretion to require strict compliance with its local rules," it can also "exercise [its] discretion in a more lenient direction" so long as it does not "enforce or relax the rules unequally as between the parties." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013)

(cleaned up); see also *Novak v. Bd. of Trustees of Southern Illinois Univ.*, 777 F.3d 966, 974 n.9 (7th Cir. 2015). The Court expects parties to adhere to the local rules, which includes seeking pre-approval if excess pages are needed. Umphlett, no doubt, knew that leave was required for her oversized response brief considering she sought leave under Local Rule 56.1(d)(5) to exceed the number of paragraphs allotted for her statement of additional facts. [Dkt. No. 25.]

Nevertheless, Defendant does not appear to have had any difficulty responding to Umphlett's arguments in its reply. And if Umphlett had asked for additional pages, the Court presumably would have granted the request. Because disregarding the argument portion of Umphlett's brief would arguably amount to a disproportionate remedy under these circumstances, the Court declines to do so.

Defendant also objects to Umphlett's summary judgment response brief on the basis that the argument section of the brief "barely cites" to either party's Local Rule 56.1 statement. [Dkt. 29 at 3.] Local Rule 56.1(g) provides that each summary judgment brief "must set forth legal argument in support of or opposition to summary judgment and may include a statement of facts. When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses." N.D. Ill. L.R. 56.1(g).

Local Rule 56.1 serves to "inform the court" at the summary judgment stage "of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). Here, Umphlett complies with the citation rule in her statement of facts (pages

18

1 through 11 of the brief), but the argument section of her brief (pages 19 through 26), contains just three citations to the Local Rule 56.1 statements. The Court shares Defendant's frustration with this approach and reiterates the requirement that Umphlett should have cited to the 56.1 statements when referring to facts in the argument section of her brief.

The larger concern with Umphlett's brief is that it does not separately analyze Umphlett's four claims. Rather, it sets out the legal standard for each claim, and then tells a single story of "discrimination, harassment, and retaliation" without connecting the facts to the applicable legal standards or citing *any* precedent. The brief concludes, "[w]hile the facts presented by both sides do appear to be quite jumbled, two things are abundantly clear: (i) Woodard possessed a negative bias toward Umphlett because of her disabilities, accommodation requests, and discrimination complaints; and (ii) Woodard took adverse employment actions against Umphlett based upon her negative bias." [Dkt. 22 at 26.]

Umphlett's method of presenting her argument puts Defendant and the Court to unnecessary work. Ultimately, the Court favors resolving disputes on their merits rather than on technicalities, especially after the parties have engaged in extensive discovery and prepared the factual record for summary judgment. See, *e.g.*, *Woods v. Indiana University-Purdue University at Indianapolis*, 996 F.2d 880, 884 (7th Cir. 1993) (recognizing "the equitable notion that dispositive decisions should be based on the merits rather than technicalities"). It would have been much more helpful for

Umphlett to have analyzed her claims separately with citation to the controlling caselaw, which the Court turns to now.

### B. Discrimination

Umphlett brings all of her claims under the Rehabilitation Act, which prohibits federally funded organizations from discriminating on the basis of disability. See 29 U.S.C. § 794(a). In the Seventh Circuit, the ADA and Rehabilitation Act are "functionally identical." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); see also *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012); *Carter v. City of Chicago*, 520 F. Supp. 3d 1024, 1030 (N.D. Ill. 2021). To the extent that there are differences between the ADA and the Rehabilitation Act, the Court discusses them in its claim-specific analysis below.

"To prove a claim of disability discrimination under the Rehabilitation Act, a plaintiff must show that: (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse job action 'solely by reason of ... his disability.'" *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022) (quoting 29 U.S.C. § 794(a)). "The 'solely by reason of' causation standard is stricter than the causation standard in Title I of the ADA, which the Rehabilitation Act otherwise incorporates for its liability standards." *Id.* (citing 29 U.S.C. § 794(d)); see also *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) ("The Rehabilitation Act has a stricter causation requirement: the plaintiff's disability must be the *sole* reason for the alleged discriminatory action;

20

this contrasts with the ADA, which requires only that the plaintiff's disability be *a* reason for the challenged action.").

In this case, there is no dispute that Umphlett is disabled, that she is otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation, that she was terminated twice, or that termination is a materially adverse job action. Like in so many cases, Defendant's briefs focus on causation: could a reasonable jury conclude that Defendant took adverse action against Umphlett solely by reason of her disability? Defendant analyzes causation under both the holistic approach recognized in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), and the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To make out a case of employment discrimination without resorting to *McDonnell Douglas*, "a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009)); see also *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination."). Direct evidence is "what [the employer] said or did in the specific employment decision in question." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005); see also *Nichols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007) (explaining that "[d]irect evidence is evidence which, if

believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption"). Circumstantial evidence is "evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Rudin*, 420 F.3d at 720. The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. If the evidence, taken together, would allow a reasonable jury to infer an "overall likelihood of discrimination," then summary judgment must be denied. *Id.*

Alternatively, parties can proceed under the familiar *McDonnell Douglas* burden-shifting framework, which "can be a helpful way to evaluate evidence of discriminatory intent in employment discrimination claims." *Brooks v. Avancez*, 39 F.4th 424, 433-34 (7th Cir. 2022). Umphlett has the initial burden to make out a *prima facie* case of discrimination by demonstrating that (1) she is disabled under the Rehabilitation Act; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Id.* at 434. If Umphlett successfully establishes a prima facie case, the burden shifts to Defendant to produce evidence that it took the actions complained of based on legitimate, nondiscriminatory reasons. The burden then shifts back to Umphlett to demonstrate that Defendant's reason is pretextual—"that is, an attempt to mask a

discriminatory reason with a legitimate excuse." *Id*. at 434. In some cases (like this one) "the inquiry about whether an employee is meeting the employer's legitimate work expectations overlaps with the question of pretext." *Id*. at 435. "Where legitimate expectations and pretext overlap," the Court can be "more efficient by addressing both together rather than first determining whether there is a prima facie case of discrimination and then turning to pretext"—a method that "is more in keeping with the 'whole evidence' outlook espoused by [the appellate] court in *Ortiz*." *Id*. "If the employer offers a non-discriminatory reason for the termination and we determine the reason is not pretextual," the Court "can skip the remaining analysis of the prima facie case." *Id*.

Defendant argues that it is entitled to summary judgment because Umphlett cannot prove that she was terminated due to her disability. More particularly, Defendant argues under *Ortiz* that it is entitled to summary judgment because no reasonable juror could conclude that Umphlett would have kept her job if only she had not been disabled. According to Defendant, Umphlett "was fired the first time because of her combative and hostile attitude toward management, her unwillingness to follow directions, and her statements that she did not want to work for the post office." [Dkt. 19 at 6.] "And she was fired the second time because she threatened a coworker with violence." [*Id*.] Under *McDonnell-Douglas*, Defendant argues that these same performance problems make it impossible for Umphlett to demonstrate that she was performing up to Defendant's legitimate expectations.

As to Umphlett's first termination on July 2, 2019, Defendant argues that even if there is evidence that Woodard harbored some animus against Umphlett due to her disability, "the undisputed evidence is that both Woodard and King perceived Umphlett to be unacceptably belligerent and combative in the spring of 2019." [Dkt. 19 at 8.] According to Defendant, there is nothing in the record to suggest that Woodard and King did not honestly believe that Umphlett's workplace attitude was unacceptable and grounds for terminating her at her 60-day review.

Simply stated, this argument does not view the record in the light most favorable to Umphlett, as is required at summary judgment. *Majors*, 714 F.3d at 532. Umphlett has come forward with sufficient evidence that Defendant's justification for her first termination was pretextual and that the real reason was Umphlett's disability coupled with Woodard's frustration over having to accommodate it. Woodard moved up the 60-day review so that it occurred only 14 days after Umphlett's 30-day review. At her deposition, Woodard could recall nothing in particular that motivated her to speed up the review process; King could not either. And in her 60-day review Woodard penalized Umphlett not only for her attitude, but also for injuring her foot during her first weeks of employment, even though the injury had already been held against Umphlett at her 30-day review.

Defendant's primary example of an "unacceptably belligerent" attitude is that Umphlett became "combative" during the incident on June 13, 2019 when Umphlett parked in the dock area. [Dkt. 23, ¶ 16.] This occurred just a week before Umphlett's 30-day review and had already been taken into account during that evaluation. In

Umphlett's view, the parking altercation resulted from Woodard's hostility toward and refusal to accommodate Umphlett's disability. According to Umphlett, she had previously been told by King and her union that she could park in the dock, but that Woodard nonetheless yelled at her for doing so. [*Id.*, ¶¶ 16, 18.]

Apart from the dispute over parking, Defendant offers little detailed support for its conclusion that Umphlett's poor attitude warranted termination. USPS's decision to reinstate Umphlett also undercuts Defendant's position that the termination was justified. Other evidence in the record supports Umphlett's view that Defendant's complaints about her "attitude" are just a pretext for discrimination. As Defendant acknowledges, Umphlett testified that "Woodward screamed at her during a January 2019 phone call for working only a week before getting injured" and "wrote in an April 2019 email that [Umphlett] had not been any good to the organizations since hitting the rol[l]s." [Dkt. 19 at 9.] Defendant argues that these are "best described as stray remarks unrelated to the employment decision in question, and thus insufficient to support an inference of pretext." [Dkt. 19 at 10 (quoting *Schaffer v. Glencoe Park Dist.*, 256 F.3d 616, 623 (7th Cir. 2001) (comment that plaintiff's silver car matched his hair characterized as a "stray remark" unrelated to employer's refusal to promote him). But the Court views the remarks differently when considered in their full context and, ultimately, agrees with Umphlett that they provide relevant insight into Woodard's motivation for terminating Umphlett.

According to Umphlett, Woodard was "cordial" when Umphlett initially, but her attitude immediately changed when Umphlett was injured just a few weeks into

the job and needed to miss several months of work. Woodard is alleged to have "screamed" at Umphlett "for working only a week before getting injured." [Dkt. 23, ¶ 59.] Umphlett returned to work in April 2019 and right away asked Skinner if she could be scheduled to work every other day as an accommodation for her swollen foot. Woodard ordered Skinner to deny the request. In an email to herself, Woodard rejected Umphlett's position that the Post Office "should work with her and her schedule" and emphasized that the request to work every other day "was not on her ca-17 as requested by her doctor." [Dkt. 23, ¶ 60.] Woodard concluded her email with the opinion that Umphlett "has not been any good to this organization since she hit the rol[l]s!" [Dkt. 23, ¶ 60.

Defendant downplays this email, urging that, at most, it shows that "Woodard does not like employees who seek to work less than they are able to according to their own physicians." [Dkt. 29 at 7 (citing DSOF ¶¶ 60, 11-13).] But from Umphlett's perspective, Woodard is refusing to engage in the interactive process required by the Rehabilitation Act. Woodard is emphatic that the request be denied; she does not instruct Skinner to engage with Umphlett or ask for additional documentation from her doctor. Skinner admitted that she did not give Umphlett any information about "reaching out to draft or requesting a reasonable accommodation regarding her work schedule" and could not recall whether she ever "circle[d] back around" to Umphlett after Woodard instructed her to deny Umphlett's request. [Dkt. 20 at 111 (Tr. 79:2-81:9).] Woodard also tied her denial of the scheduling accommodation to her broader judgment that Umphlett has "not been any good to this organization since she hit the

26

rol[l]s." Since Umphlett had just returned from work after an absence for her injury and resulting disability, an obvious inference a jury might reasonably draw from Woodard's statement is that she believed that Umphlett was not "any good" because of her disability and requests for accommodation and that this view of Umphlett colored Woodard's interactions.

Defendant emphasizes that it was not only Woodard who believed that Umphlett should be terminated the first time; King also "perceived Umphlett to be unacceptably belligerent and combative in the spring of 2019." [Dkt. 29 at 7.] But King was not the decisionmaker. See *Downing v. Abbott Laboratories*, 48 F.4th 793, 804 (7th Cir. 2022) (to prevail on employment discrimination claim, plaintiff "must provide evidence that the decisionmaker acted because of her" membership in a protected class). King was present at Umphlett's first termination meeting "just … to be a witness"; that was "the only part [she had] in that evaluation." [Dkt. 20 at 145-46 (Tr. 76:23-77:6).] And the record supports the view that Woodard made the decision to terminate Umphlett. Put simply, Defendant's given reason for Umphlett's first evaluation was so subjective, and Woodard's view of Umphlett's attitude is so intertwined with Umphlett's disability, that a jury should be allowed to determine whether Umphlett was terminated solely on the basis of her disability.

The Court next turns to Umphlett's February 2020 termination for the altercation with Crawford. Defendant argues that there is no evidence that this termination was motivated by discriminatory animus or was a pretext for discrimination, for two reasons. First, Defendant emphasizes that it has a "zero

tolerance" policy for workplace violence and that Umphlett admitted to violating the policy when she told Skinner in the pre-disciplinary interview that, "I should have just hit her." [Dkt. 29 at 5.] Second, Defendant emphasizes that Skinner issued the notice of removal and "Woodard merely concurred." [*Id.*]

Although a much closer call than the first termination, the Court concludes that a reasonable jury could conclude that Umphlett's second termination was due to her disability, too. Umphlett has raised doubt about whether her second termination was compelled by Defendant's zero tolerance policy. Defendant admits that Crawford did not receive any discipline for her part in the altercation. Defendant says this was because Skinner did not consider Crawford to be the aggressor but does not explain why. And this explanation is questionable given Skinner's testimony that she heard Umphlett and Crawford arguing about whether Crawford "bumped" Umphlett. [Dkt. 23, ¶ 48.]

The notice of removal summarizing the pre-disciplinary interview also reflects that Umphlett told Skinner multiple times that Crawford was the aggressor. [Dkt. 20 at 243-44.] Umphlett also told Skinner that Crawford had made threatening statements in the past. Umphlett further told Skinner, as well as the Postal Inspector assigned to investigate the incident, that she believed she was being retaliated against for filing an EEO complaint against Woodard and that she would "continue to be retaliated against as long as she is working in an area where Woodard[] has friends that would retaliate against her." [*Id.* at 249.] Nonetheless, Crawford was not

put on "emergency placement" [Dkt. 23, ¶ 48], and Defendant does not point to any evidence that Crawford was ever investigated or disciplined.

It is true that Skinner, rather than Woodard, is the one who issued the notice of removal. Nonetheless, Skinner's decision to terminate Umphlett but take no action against Crawford is circumstantial evidence that Defendant's purportedly nondiscriminatory reason for Umphlett's termination was pretextual. See, e.g., *Levy v. Wilkie*, 841 Fed. Appx. 987, 989 (7th Cir. 2021) (reversing grant of summary judgment for employer on employee's claims for race discrimination and retaliation where "a reasonable jury could find that [plaintiff] was similarly situated to but punished more severely than" a white employee who, like plaintiff, had also been accused of sexual harassment). For these reasons, the Court denies summary judgment on Umphlett's Rehabilitation Act discrimination claim.

## B. Retaliation

The Rehabilitation Act, like the ADA and Title VII, prohibits retaliation for complaining about discrimination. See *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). The three elements of a retaliation claim are that "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Trahanas v. Northwestern University*, 64 F.4th 842, 856 (7th Cir. 2023). The Court "consider[s] the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz*, 834 F.3d at 764–66). Circumstantial evidence of causation may include "(1) suspicious

timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

Defendant argues that it is entitled to summary judgment on Umphlett's retaliation claim because "even if Woodward was irritated by Umphlett's EEO filings"—something that King acknowledged—"there is not a sufficient link between the filings and the firings." [Dkt. 19 at 11.] Defendant emphasizes that Umphlett's first termination on July 1, 2019, occurred before Umphlett made an informal EEO complaint in mid-July 2019. But there is also evidence in the record that Umphlett began complaining internally at USPS about disability discrimination and retaliation as early as April 2019, making a dozen or more calls to two USPS labor management employees to complaint about the "[t]he parking, the schedule change, the blowup," and how she "was being retaliated against due to [her] injury … and disability." [Dkt. 20 at 55 (Tr. 131:12-132:15); see also *id.* (Tr. 132:7-24).] These internal complaints of discrimination based on Umphlett's disability also count as protected activity for purposes of the retaliation claim. See, e.g., *Xiong v. Board of Regents of University of Wisconsin System*, 62 F.4th 350, 355 (7th Cir. 2023) (employee engaged in protected activity by stating to vice chancellor that his supervisor had said that "people of color are not a good fit" for human resources and that he had concerns about the human

resources department's hiring and promotion practices); *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) ("an informal complaint [to supervisors] may constitute protected activity for purposes of retaliation claims"); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (hearing-impaired city employee's statement "Aren't you being discriminatory?" after supervisor asked "How can you work if you cannot hear?" was protected activity under ADA; even though employee did not go through formal procedures for filing a complaint, informal complaints about harassment could provide notice to establish employer liability). Thus, the record undercuts any argument that Umphlett's first termination occurred prior to her complaining about disability discrimination.

Turning to Umphlett's second termination in February 2020, Defendant argues that it was too remote from the filing of Umphlett's formal EEO complaint in October 2019 to support an inference of retaliation. But as just explained, Umphlett made repeated internal complaints about discrimination and harassment, and was perceived by Woodard and Skinner as constantly complaining of discrimination and retaliation. [Dkt. 23, ¶ 30.] Her October 2019 formal complaint is therefore not the only relevant protected activity for purposes of the retaliation claim.

The case on which Umphlett relies, *Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012), addresses the situation where suspicious timing is the *only* evidence of retaliation: "for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the

person who decided to impose the adverse action knew of the protected conduct.'" *Id.*
at 966 (quoting *Lalvani v. Cook Cnty.,* 269 F.3d 785, 790 (7th Cir. 2001)). "For an
inference of causation to be drawn solely on the basis of a suspicious timing
argument," the appellate court "typically allow[s] no more than a few days to elapse
between the protected activity and the adverse action." *Id.* Here, Umphlett relies on
more than just suspicious timing. Among other things, she points to King's statement
that Woodard told King she was "tired of [Umphlett] filing EEO complaints," [Dkt.
23, ¶ 57] and that Umphlett should "take a settlement and leave." [*Id.*, ¶ 51.] Viewed
in the light most favorable to Umphlett, it is apparent from the record that Woodard
was frustrated with Umphlett's continual complaints of discrimination, and that
Woodard wanted Umphlett to be terminated. A jury should be allowed to decide
whether the terminations were retaliatory.

     Finally, Defendant has not ruled out the possibility that other acts, short of
termination, could also be considered retaliatory by a jury. "For a retaliation claim, a
materially adverse action is defined as an action 'that a reasonable employee would
find to be materially adverse such that the employee would be dissuaded from
engaging in the protected activity.'" *Lesiv v. Illinois Central Railroad Company*, 39
F.4th 903, 911–12 (7th Cir. 2022) (quoting *Poullard v. McDonald*, 829 F.3d 844, 856
(7th Cir. 2016)). This standard is "easier to satisfy than the comparable standard for
Title VII discrimination claims, which is 'limited to discriminatory actions that affect
the terms and conditions of employment.'" *Id.* at 912 (quoting *Burlington Northern &*

*Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006)). "Context is often key in distinguishing between material actions and petty slights." *Id*.

Other than the two terminations, Umphlett claims that Woodard also retaliated against her by: reporting her to OIG for suspected medical fraud, even though at her deposition Woodard could not provide any particular reason for believing that Woodward's documentation was false and there is no evidence in the record that it was false; directing Skinner to issue her a 5-day notice of attendance, which Umphlett says was baseless; and manipulating her schedule, for instance scheduling her for only a few hours a day and refusing to allow her to work at the window in Park Forest while requiring her to work the window at other locations. A jury contemplating what would dissuade a reasonable employee from engaging in protected activity is entitled to consider evidence beyond the two terminations when deciding Umphlett's retaliation claim. For these reasons, the Court denies summary judgment on the retaliation claims.

### C.   Failure to Accommodate

"The Rehabilitation Act requires a federal employer to reasonably accommodate the known physical and mental disabilities of a qualified employee." *McCray v. Wilkie*, 966 F.3d 616, 620–21 (7th Cir. 2020) (citing 29 U.S.C. § 794). The Rehabilitation Act incorporates the standards of the ADA, so the Court looks at case law decided under both standards in determining whether an employer has discriminated against its employee. *Id*. "To establish a claim for failure to accommodate, a plaintiff must show that: (1) [ ]he is a qualified individual with a

disability; (2) the employer was aware of h[is] disability; and (3) the employer failed to reasonably accommodate the disability." *DiFranco v. City of Chicago*, 589 F. Supp. 3d 909, 915 (N.D. Ill. 2022). In addition, "[a]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate his disability." *McCray*, 966 F.3d at 621; see also *Jay v. Intermet Wagner*, 233 F.3d 1014, 1017 (7th Cir. 2000). "Whether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations." *McCray*, 966 F.3d at 621.

The parties focus on two alleged failures to accommodate: (1) Defendant's denial between April and July 2019 of Umphlett's request for a scheduling accommodation (one day on, one day off to accommodate her swollen foot); and (2) Woodard's June 13, 2019 refusal to allow Umphlett to park in the post office's dock area, which continued until Plaintiff was first terminated in July 2019. Defendant argues that neither constitutes a failure to accommodate because the particular accommodations that Umphlett sought were not reflected on the CA-17 form filled out by her doctor. But this does not foreclose the possibility that a reasonable factfinder could conclude that Defendant refused to engage in the interactive process when it denied the two accommodations.

34

When Umphlett asked Skinner if she could be scheduled every other day, she was requesting a modified work schedule as an accommodation for her disability. Defendant's handbook provides that "[r]equests for reasonable accommodation can be made orally or in writing" and that an employee "may use plain language and need not mention the Rehabilitation Act or use the phrase 'reasonable accommodation to his or her supervisor or manager or the Manager, Human Resources (District)." [Dkt. 24-2 at 2.] Woodard stated that she denied the accommodation because it was not reflected on the CA-17. But there is no evidence that Defendant's policy mandated that a particular form be used to make a request; indeed, the handbook suggests otherwise. Nor is there evidence that Woodard, Skinner, or anyone else told Umphlett that she needed a modified CA-17 to request a scheduling accommodation. See [Dkt. 20 at 111 (Tr. 79:2-81:9) (Skinner's admission that she did not give Umphlett "any information as to reaching out to draft or requesting a reasonable accommodation regarding her work schedule").] Although Umphlett tried contacting labor employees Markland and Obergone over a dozen times, nothing was done to accommodate her before she was fired. [Dkt. 20 at 55.]

As to the parking accommodation, Defendant claims that Umphlett "does not even attempt to engage with Woodard's policy that, because of past accidents, *no one* can park in the dock as Umphlett had requested." [Dkt. 29 at 10.] But as Umphlett points out, that was *Woodard*'s policy, not the USPS's. According to Umphlett, she had received permission to park in the dock. King testified that when Umphlett was allowed to return to work following her July 2019 termination, "she was also granted

35

the parking privilege" that she had requested and was allowed to park in the dock. [Dkt. 20 at 141.] This lends support for Umphlett's position that the parking arrangement was a reasonable accommodation in the first place. Under these circumstances, a jury must be allowed to decide whether Defendant failed to provide reasonable accommodations for the disability.

### D. Hostile Work Environment

The Seventh Circuit has concluded that hostile work environment claims are cognizable under the ADA. See *Ford*, 942 F.3d at 851. Since the Rehabilitation Act is interpreted consistent with the ADA, the Court assumes that *Ford* "allows for hostile work environment claims under the Rehabilitation Act, too." *Washington v. McDonough*, 2021 WL 1962420, at *6 n.4 (N.D. Ill. May 17, 2021) (citing *Ford*, 942 F.3d at 851). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Ford*, 942 F.3d at 851 (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). "A hostile work environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To succeed on such a claim, the "plaintiff must demonstrate that (1) she was subject to unwelcome harassment; (2) the harassment was based on disability … ; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or

abusive atmosphere; and (4) there is a basis for employer liability." *Brooks*, 39 F.4th at 441.[3]

Defendant argues that it is entitled to summary judgment on Umphlett's hostile work environment claim for three reasons. First, Defendant argues that there is no evidence that any of the harassment Umphlett perceived was motivated by her disability. The Court rejects this argument for the reasons explained above in relation to the discrimination claim.

Second, Defendant asserts that there is no evidence that any of the hostile conduct was so severe or pervasive that it altered the conditions of Umphlett's employment. See *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999). Defendant's analysis of the hostile work environment claim focuses on acts other than Umphlett's terminations, including that: the Post Office failed to immediately pay Umphlett for 38 hours of work; Woodard was rude to her; when Umphlett returned after her first termination, she was not immediately given a cash register till; for a time she was assigned to sort bulk mail instead of working at the customer window; she was sometimes sent to the Matteson and Richton Park to work the window; she

---

[3]     Although Defendant does not challenge Umphlett's ability to satisfy the fourth element, the Court notes for clarity that "[d]ifferent standards apply in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker." *Id.* (citing *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022)). For supervisors, an employer is strictly liable when a "supervisor's harassment culminates in a tangible employment action." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "Absent such action, an employer may raise an affirmative defense to avoid liability." *Trahanas*, 64 F.4th at 853. In this case, Woodard—Umphlett's supervisor—is accused of engaging in most of the harassment, including harassment culminating in Umphlett's two firings, which are prototypical "tangible employment actions." *Trahanas*, 64 F.4th at 853. Skinner and King are also Umphlett's supervisors, to the extent that any of their conduct could also be said to contribute to the hostile work environment.

was required to wear a former employee's used shirt, which was falling about at the seams; Umphlett was not assigned enough hours; and Defendant did not investigate Umphlett's complaints of discrimination and harassment. [See Dkt. 19 at 14-15; Dkt. 29 at 11-12.] However, the Seventh Circuit has recognized that "[a] plaintiff can establish an 'alteration in the terms or conditions of his employment' with '*either* a tangible employment action (such as discharge, demotion or undesirable reassignment) or a non-tangible action such as discriminatory ' conduct which is so severe or pervasive that it creates an abusive working environment." *Silk*, 194 F.3d at 804–05 (emphasis added); see also *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005); *Parker v. Authority*, 2020 WL 7183747, at *8–9 (N.D. Ill. Dec. 7, 2020). Thus, the Court also takes into account the terminations. Considering the record as a whole and in the light most favorable to Umphlett, she has satisfied the requirement that the alleged harassment altered the conditions of her employment.

Finally, Defendant moves for summary judgment on the basis that Umphlett cannot show that her working environment was objectively hostile. See *Silk*, 194 F.3d at 805 ("Moreover, the abusiveness of the working environment must qualify both objectively (that is, it must be an environment that a reasonable person would find hostile or abusive) and subjectively (that is, this employee subjectively perceived it to be abusive)"); *Mannie*, 394 F.3d at 983 (in addition to demonstrating an alteration in the terms and conditions of employment "the plaintiff must demonstrate that the workplace was both subjectively and objectively hostile"). The fact "that a supervisor was 'standoffish, unfriendly, and unapproachable [does not] establish[ ] an objectively

hostile work environment.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 463 (7th Cir. 2021) (quoting *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 624-25 (7th Cir. 2004)).

Here, Woodard's alleged conduct goes well beyond being standoffish, unfriendly and unapproachable. In Umphlett's view, Woodard—who was the Postmaster, Umphlett's boss, and also Skinner and King's boss—shunned her and repeatedly tried to get her fired, without justification, because she was disabled and needed accommodations for her disability. The summary judgment record contains evidence that when Umphlett was injured and off work for several months, Umphlett screamed at her for hurting herself so soon after beginning the job. As soon as Umphlett returned to work from her injury, Woodard refused to consider a scheduling accommodation and instructed Skinner to refuse it, too. When Umphlett parked in the dock with the permission of King and the union, Woodard allegedly screamed at her in a condescending manner. Woodard threatened Umphlett that she would be fired for not completing training by a certain date. Once Umphlett completed training, Woodard refused to give her a voucher to purchase a uniform, like other PSEs received. Woodard made the decision to terminate Umphlett at her 60-day review; as explained above, there is evidence that termination was motivated by discriminatory animus. USPS required Umphlett to be reinstated with full pay, benefits, seniority, and her uniform allowance, and was also allowed to park in the dock. When Umphlett returned, Woodard refused to assign her to the window, claiming it was due to her work restrictions, but sent her to other post offices to work

at their windows. While working in Park Forest, Umphlett was assigned to sort bulk mail at odd hours and for only two hours a day.

Woodard approved of Umphlett's second termination, as well, and made no attempt to investigate Umphlett's allegations that Crawford had been the instigator. After Umphlett was reinstated following the second termination, Woodard reported Umphlett to the OIG for "possible falsification of medical records," even though Woodard never asked Umphlett about the records or instructed Skinner or King to ask, Woodard could not subsequently recall why she believe the records were falsified, and there is no evidence Umphlett was faking her disability. As soon as the OIG declined to investigate, Umphlett went "[b]ack to the drawing board" and came up with a plan to "stick to attendance" as a way to get rid of Umphlett. [Dkt. 20 at 306.] King followed Woodard's direction and in March 2021 sent Umphlett a pre-disciplinary letter concerning her attendance. There is also evidence that Umphlett's "clock rings" were being deleted around this period, changing Umphlett's time records. Taking all this conduct together and viewing it in the light most favorable to Umphlett, the Court cannot say that a reasonable jury could not agree that Umphlett was forced to work in an objectively hostile work environment. *Scaife v. United States Department of Veterans Affairs*, 49 F.4th 1109, 1117 (7th Cir. 2022) ("a harasser who has direct supervisory control over an employee continues to maintain more weight in the [hostile work] analysis").

Although there is not much case law considering disability-based hostile work environment claims, the Court finds *Ford*, 942 F.3d 839, instructive. In that case, the

plaintiff was a former sheriff's deputy who, like Umphlett, suffered from complex regional pain syndrome. The alleged harassment in that case consisted of the plaintiff's co-worker commenting that the plaintiff should be required to prove her disability to avoid shifts in certain areas of the sheriff's department office, that the plaintiff was faking a disability, and another co-worker questioning whether she was really in as much pain as she claimed. The *Ford* court concluded that this was not "sufficiently severe or pervasive to have altered the conditions of the employee's employment, as required to support an ADA hostile work environment." 942 F.3d at 857. Here, by contrast, it was Umphlett's supervisor, the Postmaster, who not only yelled at her for getting injured and needing closer parking, but also repeatedly tried to have her terminated on arguably pretextual grounds and reported her to OIG for suspected fraud. A jury should be allowed to decide whether Woodard's treatment of Umphlett was objectively hostile. Summary judgment is therefore denied as to the hostile work environment claim.

## IV.  Conclusion

For these reasons, Defendant's motion for summary judgment [Dkt, No. 18] is denied.

Enter: 20-cv-7406
Date:  July 6, 2023

_____
Lindsay C. Jenkins
United States District Judge